*Reversed and dismissed.*

HURT, Presiding Judge, absent.

---

ELIJAH SWAN *v.* THE STATE.

No. 1791. Decided October 19, 1898.

**Murder in First Degree—Charge.**

See facts which are held to be amply sufficient to establish murder in the first degree, and upon which it was further held that the court did not err in failing or refusing to submit in the charge the issue of murder in the second degree.

APPEAL from the District Court of Bastrop. Tried below before Hon. ED. R. SINKS.

Appeal from a conviction for murder in the first degree; penalty, death.

The indictment charged appellant with the murder of Clifton Swan, on the 23d of June, 1898, by shooting him with a pistol. Clifton Swan was the father of appellant.

Independent of defendant's confession as set out below, the testimony showed in substance that defendant was 19 years of age, and that he lived with his father and stepmother. That he had run off from home once or twice, and his father had whipped him for it. About two years before the killing, defendant had whetted his knife and told Jim Wilson that he intended killing his father that night after he went to sleep; and Wilson testified that during the night he, defendant, got up and looked for the knife, which he, Wilson, had thrown out of the window while defendant was asleep. That defendant told him, Wilson, that if he, Wilson, heard at any time of the old man being killed, he could know he did it.

Wade Bell testified, that on the evening before the killing defendant told him he was going to the party that night, but his father did not want him to go. "I told him his pa might come after him, and he told me that when he goes to sleep to-night he will never wake up any more."

Laura Swan, defendant's stepmother, testified that defendant wanted to get her buggy to take a girl to the party that night, but she would not let him have it for fear it might get injured. She testified that her husband had some time before the killing given her a silver-plated six-shooter which she kept in a certain bureau drawer in the house, and that no one knew where this pistol was kept but her husband, defendant, and herself. That when she left home the day before the killing the pistol was in the drawer where she kept it, and was loaded all around with short cartridges. That there were some long cartridges in another drawer.

Threats by defendant against his father were also proved by Harry Ates and Riley Davidson. Meander Torres and Henry Marshall testified that defendant came and notified them that some one had shot his father. They went to deceased's house, and they found a pistol lying upon the gallery, a little to the right of the door. It had an empty barrel with a long empty shell in it, the other barrels being loaded with short cartridges. This pistol they recognized as the one deceased had given his wife; and this pistol was exhibited on the trial and recognized and identified by Laura Swan as her pistol. All the witnesses testified that deceased had no enemies in the country.

George W. Davis testified: "I am the sheriff of Bastrop County. After defendant had been arrested on this charge, and while in my office and in the presence of W. E. Maynard, the district attorney, and H. N. Bell, a deputy sheriff, and Harry Swan, an uncle of the defendant, the defendant made a statement in reference to the killing of deceased. Before defendant made the statement the district attorney said to him: 'If you have any statement to make in reference to the shooting of your father, Clifton Swan, we would like to hear it; but you are not required to say anything, and if you do make a statement it must be free and voluntary on your part, and it will be used in evidence against you in the trial of this case.' He was further told by the district attorney that if he had heretofore made any statement he could, if he wished, retract it, and now make such statement as he saw proper. After this, defendant said: 'I killed my father, and there is no use in denying it. I shot him at our house on the night of the 23d day of June, 1898, at our home in Bastrop County, Texas. No one was at home but us two. I went to bed in one room and he in the other. I went to sleep, and afterwards got up and got papa's pistol and stood at his room door and shot him in the side, and when I shot him he hallooed, and this scared me so badly I threw the pistol down. I don't know exactly where I threw it. I went back afterwards and looked for it, but could not find it. I then ran and told the neighbors some one had killed papa. I killed him with his pistol, and the one shown me looks like the one I shot him with. I took out one of the short cartridges and got a long one out of another drawer, and put it in the pistol, and it was this one I shot papa with.' In answer to the question as to why he shot his papa, he said: 'I shot him because he whipped me that evening, and he then told me he had two or three more whippings down in his book for me, and because I wanted to have the property and be my own boss, and because another person persuaded me to do it.'"

H. N. Bell testified. (It was agreed that the testimony of this witness was the same as that of George W. Davis.)

Defendant also confessed to his uncle, Harry Swan, that he had killed his father.

Defendant testified, in his own behalf, that he did not kill his father, and did not know who did it. He admitted making the confessions to Mr. Bell and his uncle, Harry Swan, and that he had been duly warned

before making the confession to Bell, but that he was induced to make a confession by his uncle telling him that, whether he did it or not, the circumstances were against him, and that it would be easier on him to say that he did it.

No brief on file for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death.

There are only two assignments of error in the record, both involving the same question, to wit, the refusal of the court to charge on murder in the second degree. We have examined the record very carefully, and do not find that the evidence required a charge on any grade of homicide less than murder in the first degree. The confessions of the defendant clearly show a case of assassination. Aside from the confessions, the evidence is purely circumstantial; but it points unmistakably to a deliberate and cold-blooded murder, which had been premeditated some time before its commission. Deceased was the father of the appellant, and, because of his refusal to allow his son (defendant) to attend a party in the neighborhood on the night of the homicide, he carried out a plan to kill his father, which he had repeatedly threatened. On the night of the homicide, his stepmother was away from the premises, attending the funeral of her mother, and no one was left at home except the father and son. They were sleeping in separate rooms. Near midnight, defendant crept from his bed, procured a pistol, which he had prepared, went to the room in which his father was sleeping, and, without warning, shot him, then hied to a neighbor's, and, doubtless in pursuance of his preconceived plan, stated that some one else had come to the house and shot his father while they were asleep. This statement was not only shown by circumstantial evidence of the most cogent character to be false, but was also stamped as a falsehood by appellant's own subsequent confession. Under the evidence, there was nothing less than murder in the first degree, and the court did not err in refusing to give the requested charge. The judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, absent.